# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

VERONICA Y. GUDGER,        )
                                         )

        Plaintiff ,            )
                                         )

v.                               )     Case Number: 1:14-cv-00576-RMC
                                       )

DISTRICT OF COLUMBIA, et al,    )
                                       )

        Defendants.        )

## PLAINTIFF'S TRIAL MEMORANDUM

The Plaintiff, VERONICA Y. GUDGER, hereby submits this Memorandum to

assist the Court in understanding the material facts she intends to introduce at trial, the

relevancy of those material facts, and the legal authorities that render such facts

admissible.  This Trial Memorandum is also intended to assist the Court in evaluating the

usefulness and propriety of (1) the proposed jury instruction the Plaintiff is filing with this

Memorandum (to be given at the commencement of the case to help explain the limited

purpose of certain evidence), and (2) the Special Interrogatories and General Verdict

question submitted with this memorandum.

## I.     Plaintiff's Theory of the Case:

Defendant Millsaps received the arrest warrant for Darryl Marable with a stack of

other warrants.  The arrest warrant for Darryl Marable was for failure to appear in a child

support case.  Marable was not a wanted person for a felony crime.  Marable was not a

parolee wanted for a parole violation.  The arrest warrant listed 1416 Holbrook Street,

NE, Washington DC, as Marable's address.  The rest were did not provide a specific apartment number.  That apartment building contains four units: Apt. #1 and Apt. #2 are downstairs; Apt. #3 and Apt. #4 are downstairs.  The exterior door leading into the building is locked.

On August 19, 2013, he generated a MYJUSTIS report for each of his warrants but did not read them.  On August 21, 2013, in preparation for executing several different warrants, Millsaps realized that he needed a WALES report for Marable because the MYJUSTIS report was insufficient for him to determine where Marable lived, or Millsaps had simply misplaced the MYJUSTIS report for Marable and needed an apartment number to go with the address on the arrest warrant.

Two hours before Millsaps went to 1416 Holbrook Street, N.E., he pulled a WALES report on Marable.  The WALES report identified Apt. #1 as the most recent address (from Aug. 16, 2013) and the source of Apt. #1 was the court case from which the arrest warrant was issued.

Millsaps did not contact the warrant squad for information about their past efforts to locate Marable, nor did he conduct any surveillance or interviews at 1416 Holbrook Street to gain more information on where Marable resided.   When Maya Gudger opened the exterior door to the apartment building to allow Millsaps to enter, Millsaps did not bother to ask Maya whether she knew Marable or if a man meeting his description resided within Apt. #1 or Apt. #2.

Millsaps went to Apt. #2 and knocked on the door to gain information about where

Marable resided.  Millsaps did not believe at the time that he went to Apt. #2 that Marable lived within Apt. #2 or was actually there at that time.  Millsaps could not tell from the information he had that morning whether Marable lived in Apt. #1 or Apt. #2.  This is why Millsaps has contended from the very beginning that he entered the Plaintiff's home on the authority of her consent.

The Plaintiff contends that Millsaps intended to use the power of his badge in uniform to intimidate the Plaintiff into consenting to a search of her home.  When the Plaintiff open the door, Millsaps immediately walked towards her across the threshold of the doorway asking, "who's in here with you?"  The Plaintiff answered, "no one" and back up slowly to preserve her personal space because she was naked under a shirt and shorts that she had thrown on to answer the door.  (The Plaintiff answered the door without looking through the peephole because her apartment building is secured by a door in the residence of the four units all know each other.  She expected one of the other residents to be at her door.)

Millsaps continued to walk towards the Plaintiff forcing her to back up as he kept asking who was in the apartment with her.  The Plaintiff stopped backpedaling and asked for a warrant.  Millsaps told the Plaintiff that she "watch too much TV" but the Plaintiff refused to consent to a search.  Millsaps grabbed the Plaintiffs arm, swung towards her face, and took her facedown onto an air mattress where he used his knee to hold her down while he handcuffed her.  At this point, the other officers rushed into the Plaintiff's apartment.

Millsaps hand struck the Plaintiff in the mouth Clausing a laceration to the inside of her bottom lip.  The Plaintiff bled onto the air mattress and drops dripped onto her shirt.  Another officer gave the Plaintiff something to wipe her mouth, let her go to the bathroom, put on flip-flops, and escorted the Plaintiff outside to a police car.  Inside the police car, officer Schaefer gave the Plaintiff tissues to wipe blood from her face.  The police call for an ambulance unit that came and provided in ice pack to the Plaintiff. After the bleeding stopped, the Plaintiff was removed from the police car and photographed.  The Plaintiff refused to go to the hospital because her injury was minor and she just wanted the whole event to end sooner rather than later.

The Plaintiff was transported to the Fifth District station where cell block/wagaon technician Gail Haywood saw the Plaintiff's mouth bleeding again.  Ms. Haywood had the Plaintiff aboard the Paddy wagon for transport to court to meet the daily cutoff so that the Plaintiff could be presented to a judge that same day.  Officer Montanez stopped Ms. Haywood, took the paperwork pertaining to the Plaintiff, and return 47 minutes later. That delay cause Plaintiff to miss the daily court cutoff so she was forced to spend all night in the central cellblock.  The Plaintiff was released the next day (Aug. 22, 2103) late in the afternoon without ever been presented in court.  The Plaintiff had to walk home approximately 14 blocks in her flip-flops, a shirt and shorts, without a bra or underwear. She arrived home shortly before 5:00 PM.

## II.     Material Facts to be Resolved by the Jury:

A.  On the issue of qualified immunity.

    *1.  The Plaintiff's alleged consent to police entry and search of her home.*

The jury needs to decide whether Millsaps obtain consent to enter the Plaintiffs home or to search it, and whether she rescinded any consent that they find that the Plaintiff granted to Millsaps.  (Millsaps has always maintained that the reason he actually entered the Plaintiff's apartment was because she gave nonverbal consent.  The Plaintiff has always asserted that she never gave any consent of any kind.)  These factual findings are necessary for two reasons.

Firstly, consent becomes a defense for Millsaps against the Plaintiff's Fourth Amendment claims if the Court denies him summary judgment.  Furthermore, if the Court grants summary judgment to Millsaps on qualified immunity and that ruling is reversed on appeal, the Court will not have to conduct a second jury trial to resolve the issue of consent.

Secondly, the issue of consent is relevant to the Plaintiffs common-law tort claim of false arrest.  The Plaintiff had a right to protest the entry and search of her home.  See, *Hudson v. District of Columbia*, 517 F.Supp.2d 40, 49 (2007), rev'd. on other grounds, 558 F.3d 526 (2009).  There is a factual dispute as to whether the Plaintiff was expressing her ***non***consent to the police action in a lawful manner at the time she was arrested for allegedly assaulting a police officer.  In other words, the jury cannot fairly adjudicate the Plaintiff's fault suppress claim without receiving evidence pertaining to the Plaintiff's

verbal and nonverbal actions that conveyed her consent, or lack of consent, to the police intrusion.

> 2.  *The nature, scope, and value of Millsaps' alleged investigation.*

The jury also needs to decide whether Millsaps actually conducted a systematic analysis of the information pertaining to the potential residence of Darryl Marable and whether he had an opportunity to obtain additional information regarding the residence of Darryl Marable before he went to Apt. #2.  Such facts are necessary for the court's determination as to whether Millsaps conducted a ***meaningful/reasonable*** investigation that would justify granting him qualified immunity.

The Plaintiff contends that the circumstances of this case present facts that go towards the objective reasonableness determination that were not present in either *United States v. Thomas*, 429. F.3d 282 (D.C. Cir. 2005) or *U.S. v. Taylor*, 497 F.3d 673 (D.C. Cir. 2007) – cases mentioned by the Court during recent the Status Conference and Pretrial Conference.  Those distinguishing facts include, but are not limited to:

(1) Millsaps could have consulted with the paternity warrant squad to determine whether they had developed any information that eliminated or implicated any particular residence;

(2) Millsaps had the opportunity to inquire of the woman who came out of Apt. #1 (Maya Gudger) whether she knew who resided in Apt. #1 and Apt. #2, and whether she knew Darryl Marable;

(3) Millsaps was not searching for a wanted felon or parolee violator;

(4) Millsaps admitted that he did not trust DMV records as reliable; and

(5) Millsaps did not conduct any surveillance or have a lead on where Marable was living.  The Court should not limit itself to whether Millsaps had the MYJUSTIS and/or WALES data reports when it rules on the issue of qualified immunity.  The above-described facts go to the objective reasonableness of Millsaps asserted belief.  The court should not treat the facts of this case as analogous to either *Thomas* or *Taylor*, as explained below and elucidated by a thorough analysis of what the Supreme Court justices perceived to be the underlying concerns in *U.S. v. Steagald*, 451 U.S. 204, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981).

During the pretrial conference on January 6, 2016, the Court noted that the police are often confronted with situations where the suspect is moving about between a "girlfriend's house", or a "friend's house" and staying for only a few nights at a time. The Court mentioned that sometimes the suspects "keep some of their things" at a girlfriend's apartment or change residences frequently.  These fact patterns were effectively rejected in *U.S. v. Steagald* as demonstrated by the dissenting opinion of Chief Justice Rhenquist and Justice White:

> The government's interests in the warrantless entry of a third-party dwelling to execute an arrest warrant are compelling. The basic problem confronting police in such situations is the inherent mobility of the fugitive. By definition, the police have probable cause to believe that the fugitive is in a dwelling which is not his home. ***He may stay there for a week, a day, or 10 minutes. Fugitives from justice tend to be mobile, and police officers will generally have no way of knowing whether the subject of an arrest warrant will be at the dwelling when they return from seeking a search warrant***. See United States v. McKinney, 379 F.2d 259, 263 (CA6 1967); State v. Jordan, 288 Or. 391, 400–401, 605 P.2d 646, 651 (1980) (en banc).

> Imposition of a search warrant requirement in such circumstances will frustrate the compelling interests of the government and indeed the public in the apprehension of those subject to outstanding arrest warrants.

*Steagald*, 451 U.S. 204, 225

Justice Rhenquist goes on to talk about the negative impact the Steagald opinion could have on efforts of law enforcement to seize fugitives if a search warrant is required (but he emphasizes that exigent circumstances could be a basis for entry without a warrant anyway).  In so doing, Justice Rhenquist speaks in terms of capturing a "felon" (451 U.S. at 226 ("[a]t the same time the interference with the Fourth Amendment privacy interests of those whose homes are entered to apprehend ***the felon*** is not nearly as significant as suggested by the Court."), and again at 227 ("[t]he duty of the populace to aid in the apprehension ***of felons*** was well established at common law, see *Roberts v. United States*, 445 U.S. 552, 557, 100 S.Ct. 1358, 1362–1363, 63 L.Ed.2d 622 (1980)).[1] Justice Rhenquist also speaks in terms of "criminals" ("The genuinely unfortunate aspect of today's ruling is not that fewer fugitives will be brought to book, or fewer criminals apprehended, though both of these consequences will undoubtedly occur; the greater misfortune is the increased uncertainty imposed on police officers in the field, committing magistrates, and trial judges, who must confront variations and permutations of this factual situation on a day-to-day basis.") (451 U.S. at 230.)

In *Payton v. New York*, the Supreme Court was discussing warrantless entry into a home to effect a ***felony arrest*** when it recognized that "[a] longstanding, widespread

---

[1] Emphasis added to both quotes.

practice is not immune from constitutional scrutiny. But neither is it to be lightly brushed aside." 445 U.S. at 599.  By contrast, the arrest warrant that Millsaps had for Darryl Marable was for a failure to appear in a paternity case.  Even applying Chief Justice Rhenquist's reasonableness standard, forcible entry into the home of Plaintiff Gudger to execute an FTA warrant in a civil case would be unreasonable.

Millsaps effort to arrest Marable was also a "routine" attempt, as was the case in *Payton* and its companion case, *Riddick*.  445 U.S. at 583.  Exigency was not an issue in those two arrests, nor was it an issue with respect to Millsaps attempt to locate Darryl Marable.

> The parties have argued at some length about the practical consequences of a warrant requirement as a precondition to a ***felony arrest*** in the home.  In the absence of any evidence that effective law enforcement has suffered in those States that already have such a requirement, see nn. 3, 47, supra, we are inclined to view such arguments with skepticism.  ***More fundamentally, however, such arguments of policy must give way to a constitutional command that we consider to be unequivocal.***

445 U.S. at 602.  (Emphasis added.)

The Supreme Court went on to conclude that an arrest warrant would suffice in place of a search warrant despite the lesser degree of protection afforded by an arrest warrant for arrests warrants ***targeting a felon.***

> It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a ***felony*** to persuade a judicial officer that his arrest is justified, it is constitutionally reason able to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in

which the suspect lives when there is reason to believe the suspect is within.

445 U.S. at 602-03.

*Payton* and *Steagald* thus stand for the rule of law that an arrest warrant is sufficient to enter the home of a person who is wanted for a ***felony.*** The *Thomas* and *Taylor* cases out of the D.C. Circuit stand for the rule that an arrest warrant for a parolee can authorize entry into the home of the parolee. There appears to be no case law to support Defendant Millsaps assertion that he is entitled to qualified immunity based on his alleged pre-raid investigation in his effort to serve a ***non-***felon, ***non-***parolee arrest warrant. And since the concept of reasonableness is dependent on the particular circumstances of each case, the nature, scope and value of information that Millsaps could have developed before he forcibly entered the Plaintiff's home to arrest a non-felon, non-parolee needs to be considered accordingly.

The D.C. Circuit very recently restated the difference between arrest warrants and search warrants in *U.S. v. Weaver*, 808 F.3d 26 (D.C. Cir. 2015):

> The requirements for search warrants and arrest warrants protect distinct privacy interests, and the two types of warrants authorize law enforcement officers to take different actions. The interests the knock-and-announce rule protects correspondingly differ, depending on the type of warrant law enforcement officers are executing. Because of those differences, the Court's analysis in Hudson cannot apply the same way or yield the same result here.
>
> An individual's interest in protecting the privacy of his home is of the highest order. See, e.g. *Jardines*, 133 S.Ct. at 1414; *Kyllo v. United States*, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). As Justice Kennedy underscored in *Hudson*.
>
>> privacy and security in the home are central to the Fourth Amendment's guarantees as explained in our decisions and as understood since the beginnings of the Republic. This

common understanding ensures respect for the law and allegiance to our institutions, and it is an instrument for transmitting our Constitution to later generations undiminished in meaning and force. *It bears repeating that it is a serious matter if law enforcement officers violate the sanctity of the home by ignoring the requisites of lawful entry*.

547 U.S. at 603, 126 S.Ct. 2159. "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo*. 533 U.S. at 31, 121 S.Ct. 2038 (internal quotation marks omitted); see also Jardines, 133 S.Ct. at 1414 ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); *Minnesota v. Carter*, 525 U.S. 83, 99, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (Kennedy, J., concurring) ("[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people."); *Payton*, 445 U.S. at 585, 100 S.Ct. 1371 ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (internal quotation marks omitted)).

Law enforcement officers' authority under an arrest warrant to enter and search a home is both more conditional and more circumscribed than their authority under a search warrant. Officers armed with a search warrant may enter a home and search for the items described in the warrant anywhere in the home where those items might be located. See *Maryland v. Garrison*, 480 U.S. 79, 84–85, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). An arrest warrant, by contrast, authorizes a much more limited intrusion into the home. See, e.g., *Steagald v. United States*, 451 U.S. 204, 213–14 & n. 7, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In executing an arrest warrant, officers may enter an individual's home only when they have reason to believe the arrestee is there, *Payton*, 445 U.S. at 603, 100 S.Ct. 1371, may look only where a person might reasonably be found, and must stop searching once they locate him, *Maryland v. Buie*, 494 U.S. 325, 330, 332–33, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *United States v. Thomas*, 429 F.3d 282, 287 (D.C.Cir.2005).

When officers have lawfully accessed an area of the home in search of an arrestee, they may seize items in plain view that they have probable cause to believe are evidence of a crime. See, e.g., *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Arresting officers must not routinely search every room in a home; when arresting an individual at home, the arrest warrant's authority is confined to locating the person, securing the area within his reach, and making a quick

and limited sweep of the immediately adjoining areas from which an attack
could be launched. See, e.g. Buie, 494 U.S. at 327, 334, 110 S.Ct. 1093;
*Chimel v. California*, 395 U.S. 752, 763, 766, 89 S.Ct. 2034, 23 L.Ed.2d
685 (1969). Officers may also perform a sweep of other areas of the home
if they have "articulable facts which ... would warrant a reasonably prudent
officer in believing that the area to be swept harbors an individual posing a
danger to those on the arrest scene." *Buie*, 494 U.S. at 334, 110 S.Ct. 1093.2
Once officers find the arrestee, however, they are no longer authorized by
the arrest warrant to enter other rooms in the home; the arrestee retains an
expectation of privacy in those areas. Id. at 333, 110 S.Ct. 1093. In sum,
the timing and scope of lawful searches of a home pursuant to an arrest
warrant are limited by whether and where the arrestee is in the home when
he submits to arrest.

808 F.3d at 37-39.  (Emphasis added.)

In *U.S. v. McCarson*, 527 F.3d 170, 172 (D.C. Cir. 2008), the police developed

reason to believe that the subject of an arrest warrant (McCarson) was staying at his

girlfriend's residence. When the police went to that residence and knocked at the door,

McCarson opened the door and was recognized by police from a photograph. Thus,

McCarson was arrested on the warrant. Contraband seized thereafter within the

girlfriend's residence was not suppressed under *Steagald* because the Court of Appeals

recognized that the girlfriend was protected by *Steagald* and therefore had standing to

challenge the search, not McCarson. If McCarson had not personally opened the door,

then the Court of Appeals would have found the entry unlawful under *Steagald*.

In *U.S. v. Taylor*, 497 F.3d 673 (D.C. Cir. 2007), the Court of Appeals had an

occasion to review *Steagald* in the context of a suppression issue involving the conviction

of a felon using items seized during his arrest. The felon asserted that he was arrested in

violation of the Fourth Amendment because the arresting officers did not have a

reasonable belief that he lived in the house where he was arrested or that he was present

in that house at the time the officers searched the house for him.  497 F. 3d at 678.  The

felon in *Taylor* was a parolee.  The warrant squad had a parole warrant for his arrest, but

the parole warrant failed to supply an address for him.  The police asserted that they had

reason to believe that the parolee resided within his grandmother's house based on the

address contained within parole documents.  However, the evidentiary record did not

establish that the any of the officers executing the parole warrant had actually looked at

those parole documents to determine his residency.  The parolee was arrested in the

basement of his grandmother's house.  The Court found that the warrant squad had not

met the investigatory requirement imposed by *United States v. Thomas*, 429. F.3d 282,

285-286 (D.C. Cir. 2005) and therefore did not have a reasonable belief that the parolee

resided in his grandmother's house at the time they arrived there to execute the parole

warrant.  However, ***the Court found as a fact from the grandmother made affirmative***

***verbal and nonverbal statements asserting confirming that the parolee resided in her***

***house and that he was then present within it.***  497 F.3d at 679.  In so doing, the Court of

Appeals noted, more than once, that the warrant squad was executing an arrest warrant for

a parolee, just as in *United States v. Thomas*, and observed that a parolee is obligated to

supply his current address as a condition of his release.  497 F. 3d at 678.  While

recognizing these facts as dispositive in *Taylor,* the Court of Appeals emphasized the

importance that the police investigation in response to an arrest warrant be meaningful,

> ***Crucially****, we took the term "investigation" to indicate " 'a systematic official inquiry' " as opposed to "a mere hunch, surmise, or suspicion."*

497 F.3d at 678.

All of these cases teach us that an arrest warrant authorizes entry into the target's home when the target is a felon or a parolee and a systematic analysis has led the police to believe that the felon or parolee (1) actually lives at the location, and (2) is present at the time of the police intrusion.  These cases also recognize that consent to entry given by an occupant will negate the need for an investigation.  The Plaintiff thus seeks to introduce evidence relevant to these issues mindful that the concept of objective reasonableness is dependent on the unique circumstances of each case.  Unique to this case are the facts that the warrant was not for a felon or a parolee, that Millsaps had conflicting police data about where Marable resided, and Millsaps had the opportunity to engage the occupant of Apt. #1 about whether Marable was known to reside within either Apt. #1 or Apt. #2 before Millsaps forcibly made entry into Apt. #2.  Also unique to this case is the fact that Millsaps has given conflicting sworn statements and that he did not produce pertinent documents until the 11th hour.  Since qualified immunity does not protect "those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), Millsaps cannot escape liability if the jury decides facts against him that would enable the Court to conclude that he knowingly violated the law by trying to intimidate his way into Plaintiff Gudger's home when he had no true belief that Darryl Marable resided there or was actually within her home at the time.

## III.   Conclusion:

The scope of evidence admissible in this case includes facts pertaining to the investigation that Defendant Millsaps allegedly conducted, investigatory actions that defendant Millsaps could have undertaken towards making a determination as to where Darryl Marable resided, facts known to the Plaintiff and May Gudger (occupant of Apt. #1) pertaining to where Darryl Marable had resided in the past the Plaintiff's actions that bear on whether or not Millsaps had consent to enter or search Plaintiff's home, and facts pertaining to the plaintiffs state of mind in terms of her rights under the fourth amendment in order to show why she would refuse consent and protest Millsaps effort to enter and search her home.

Respectfully submitted,

/s/
Kenneth E. McPherson,  Bar No. 419177
6801 Kenilworth Avenue
Suite 202
Riverdale, Maryland  20737
301-277-4727 office
240-432-8970 mobile
301-432-8970 fax
kemlawyer@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of January, 2016, I served this Memorandum via the ECF system, to:

STEVE ANDERSON, Assistant Attorney General
**Office of the Attorney General for the District of Columbia**
441 Fourth Street, N.W., Suite 6S012
Washington, D.C. 20001.

*Attorney for the Defendant.*


_____/s/_____
Kenneth E. McPherson